## LOVE *v.* PEEL.

### Opinion delivered June 18, 1906.

1. CONTRACT OF EMPLOYMENT—TERMINATION BY DEATH.—Where the appointment of a commissioner to collect claims against the United States in favor of one of the Indian tribes was induced by a reliance on his skill and integrity, such appointment was terminated by his death, and his executors, administrators or heirs could not employ another to carry out the contract. (Page 372.)

2. ESTOPPEL—ACQUIESCENCE.—A commissioner appointed by one of the Indian tribes to collect certain claims against the United States died before accomplishing anything toward such collection, and his heirs and representatives selected an attorney to prosecute the claim on behalf of the estate of the deceased commissioner. Subsequently such attorney was employed by the tribe to represent them, independently of the estate of the deceased commissioner, and he proceeded, with the knowledge of such heirs and representatives, to prosecute the claim of the tribe under the latter employment for a long time and to incur great expense in doing so. *Held* that the heirs and representatives were estopped to claim any part of the fees received by the attorney under employment by the Indian tribe. (Page 373.)

Appeal from Benton Chancery Court; *T. H. Humphreys,* Chancellor; affirmed.

*W. M. Cravens,* for appellants.

While, in view of the act, § § 2103-4-5, Rev. Stat. U. S., appellee might not be able to recover upon the contract between him and .Love,· without such agreement being approved as provided in the act, yet the act was never intended to defeat the rights of the Indian, if any, to recover from a citizen of the United States any moneys or things of value due him under such contract. 23 Ark. 77; 122 Ind. 54; 23 N. E. 1080; 148 U. S. 222; 37 Law Ed. 429; 164 Ark. 72. Appellee, having accepted the employment with retainer fee for his services, having never repudiated the employment nor paid back· nor offered to repay the fee accepted by him, was bound to use all legal means to recover for his clients the money due them, and, having recovered the money, can not now be heard to say that the contract was void because it had not been approved by the Secretary of the Interior. He stands in a relation of trust toward his clients, and can not place himself in an adversary position. 101 U. S. 494, 25 Law. Ed. 1065; 52 U. S. 232; 106 U. S. 586, 27 Law. Ed. 306; 30 Ark. 44; 27 Fed. 782; 38 Iowa, 649; 10 Pet. 269. See, also, 159 U. S. 317; *Ib.* 319; 3 Am. & Eng. Enc. Law 2 Ed. 295, and cases cited; *Ib.* 296; *Ib.* 266; 53 Cal. 272; 12 R. I. 84; 15 Cal. 387; 15 Barb. 650; 25 Pa. 354.

*McGill & Lindsey,* for appellee.

The testimony is uncontradicted that Peel collected the money under and by virtue of his contract with the Chickasaw Nation, and not under the contract with Love, and that he could not have collected under the Love contract. Whatever authority Colbert, Love or Peel had to prosecute the claim was derived primarily from the Chickasaw Nation. Being a claim due from the United· States to that tribe of Indians, the contracts and agreements in evidence all come within the purview of the act. Rev. St. U. S. § 2103. Contracts not in accordance with the requirements of the statute are void and can not be enforced. Bishop on Cont. § 613; 15 Am. & Eng. Enc. Law (2 Ed.), 935, *et seq.;* 25 Ark. 209; 32 Ark. 619; 47 Ark. 378; 48 Ark. 487; 63 ·Ark. 318; 3 McLean (U. S.), 276; 21 Wall, 441; 50 N. J. Eq.

761; 35 Am. St. Rep. 793; 71 *Ib.* 772; *Ib.* 837; 191 Pa. St. 582;
92 Tex. 219; 71 Vt. 253; 76 Am. St. Rep. 767.   The Legislature
of the Chickasaw Nation could at any time, acting for the public,
have revoked the authority of Colbert as commissioner, agent
or attorney.   1 Am. & Eng. Enc. Law (2 Ed.), 1216-1219; 3 *Ib.*
409-411.   His agency was in fact terminated by his death.   1
Am. & Eng. Enc. Law (2 Ed.), 1226.

In the situation presented appellee had the right to repudiate
the contract with Love, because it was void and prohibited by
statute.   48 Ark. 487.   And notice of its ·repudiation was not
necessary.   A void contract can not be made valid and binding
by failure to give notice of its repudiation.

The act whereby appellee was employed repealed all the pre-
vious acts on the subject, by implication, that were in conflict
with it.   None of the previous acts were contracts in the sense
that they could not be impaired by subsequent legislation, even if
they had been valid; but, not being valid, they had no binding
force which could be impaired.   15 Am. & Eng. Enc. Law, 1044;
Cooley's Const. Lim. (5 Ed.), 346.

Appellee contends that his employment by the Nation was
known to or acquiesced in by Love.

The statute which prohibits the making of certain contracts,
makes no exception in favor of contracts made with attorneys,
and the courts can make none.

No validity can be given to the contract through any prin-
ciple of estoppel.   It would be the duty of a court of equity to
refuse to enforce it, even if its illegality were not pleaded.   15
Am & Eng. Enc. Law (2 Ed.), 1013; 47 Ark. 351; 13 Otto, 261;
165 Mass. 501.

BATTLE, J.   Overton Love, Betsy Colbert, and Eula Myers
belong to and are a part of the tribe of Chickasaw Indians, and
reside in the Chickasaw Nation, Indian Territory, and Betsy
Colbert is the widow, and Eula Myers is the only surviving child
and heir, of Holmes Colbert, deceased.

On the 24th day of October, 1867, the Legislature of the
Chickasaw Nation passed an act appointing Holmes Colbert com-
missioner for and in behalf of the Chickasaw Nation to collect
certain claims and demands of the Nation against the United
States, arising under the treaties of 1832 and 1834 between the

United States and the Chickasaws, allowing him a fee of twenty-five per cent. upon whatever amount he may recover in full satisfaction for his services, and authorizing him to employ at his own expense whatever additional counsel, aid, or assistance that may be necessary to enable him to collect such demands and claims. Holmes Colbert accepted the appointment, and entered upon the discharge of the duties of the office, and so continued until the 24th day of March, 1872, when he died.

On the 8th day of May, 1872, the Legislature of the Chickasaw Nation passed another act authorizing and requiring the Governor of the Nation to appoint some competent person commissioner to fill the vacancy caused by the death of Colbert, to make all necessary settlements, to carry out contracts made by Colbert "with his attorneys at Washington, as originally agreed upon by him, and no further, to settle and pay over all moneys arising under said contract to his widow, or to the administrator" of his estate; and, "upon being notified of the final adjustment of said claims," to "proceed to Washington and receive all funds that may have been awarded by the Government under said contract, and proceed at once to disburse the same according to the original agreement of said H. Colbert, and to settle with and pay over all moneys *due* to his widow or to the administrator of the said H. Colbert's estate."

On the 30th day of June, 1893, Overton Love, acting for himself, Betsy Colbert and Eula Myers, entered into the following contract with Samuel W. Peel:

"Whereas, the Chickasaw Nation of Indians has a claim against the United States for arrears of interest at five per cent. on the sum of $240,164, or about that sum, which sums were erroneously dropped from the books of the Treasurer of the United States many years ago and restored by the award of the Honorable Secretary of the Interior, as provided by the fourth article of the treaty between the United States and the said Nation of Indians in the year 1852, which claim for interest now amounts to about $550,000.

"And, whereas, the said Chickasaw Nation many years ago employed and appointed one Holmes Colbert to collect said claim, with interest thereon, agreeing to pay him for his services a sum equal to 25 per cent. of the amount recovered, and, whereas, the

said Holmes Colbert departed this life many years ago, and before any part of said claim was collected, leaving his widow and one daughter his sole heirs. And, whereas, said widow, daughter, has substituted Overton Love of the Chickasaw Nation to prosecute · said claim for interest (the principal having been paid).

"Now, therefore, I, Overton Love, of the Chickasaw Nation, do hereby employ Samuel Peel of the town of Bentonville, Arkansas, as the attorney in the case to prosecute said claim for interest, either in the courts, before Congress, or any department of Government, or any commission of the Government, and for his services I agree to pay him the sum of $30,000 out of the 25 per cent. of said claim; if not but only a portion of said claim is recovered, then in proportion or at the rate to which $30,000 bears to the whole amount of said claim, the said Peel agreeing to give said claim all needed attention. Made and executed in duplicate at Sherman, in the State of Texas, on this the 20th day of June, 1893.

[Signed] "Overton Love."

The following receipt was appended to the contract: "Received from Overton Love as a retainer in the above case $2,500, June 30, 1893, to be deducted out of my fee.

[Signed] "S. W. Peel."

Peel undertook to perform his part of this contract, and so continued for about one year.

On the 26th day of September, 1894, the Legislature of the Chickasaw Nation passed an act, which was approved by the Governor on the day following, and which authorized the Governor of the Nation to contract with and employ Samuel W. Peel, an attorney at law, to collect interest on said claims against the United States, the principal having been paid, and to pay him for his services ten per cent. upon whatever amount he may "secure;" and repealed all acts and parts of acts in conflict with the last act.

On the 26th day of September, 1894, the Governor of the Chickasaw Nation entered into a contract with Peel in the manner provided by the act of September 24, 1894. It was stipulated in the contract that it should continue for six years from date; and it was executed and approved in the manner provided

by section 2103 of the Revised Statutes of the United States.

Under the latter contract Peel recovered $557,189.43, of which $55,718.94 was paid to him for his services, and the remainder was paid to the Chickasaw Nation.

Overton Love, Betsy Colbert and Eula Myers, alleging that the services rendered by Peel to the Chickasaw Nation were performed by him under his contract with Love, and that he received of the sum recovered $55,852.05, and that Love paid him $5,500 on the contract Love made with him, making in the aggregate $61,352.05 received by him, of which he is only entitled to $12,008.19 leaving $49,343.86 to which he was not entitled, brought suit in the Benton Chancery Court against Samuel W. Peel, to recover the $49,343.86, alleging that it belonged to them.

The defendant answered, and denied that the services rendered by him to the Chickasaw Nation were performed under the contract with Love; that he received of the amount recovered $55,852.05, and that Love paid him on contract with him $5,500; and alleged that his services were performed under the contract he made with the Governor of the Chickasaw Nation on the 26th day of September, 1894; that he received of the sum recovered by him $55,718.94, and that out of this fee collected by him he paid to counsel employed by him to assist him and for necessary expenses for a period of five years, which he devoted to the performance of his contract, about $25,000; and that the amount paid on the contract of Love with him was $2,500, and that for about one year thereafter he "devoted his professional services to the prosecution of said claim (the claim he was employed to collect) in good faith under said contract, and expended for traveling, hotel bills, office rent, etc., at least $1,500 when he discovered that the contract of plaintiff for the prosecution and collection of said claim was invalid because it was not executed and approved in the manner provided by section 2103 of the Revised Statutes of the United States; that the same was not recognized by the Government of the United States nor by the Chickasaw Nation; that nothing could be collected for said Chickasaw Nation or for the members thereof under the same, nor attorney's fees could be collected for the prosecution of the same;" and that his professional services rendered under the contract with Love were worth more than $1,000.

Defendant pleaded other defenses in bar of plaintiff's suit.

The chancery court dismissed the complaint of plaintiffs for want of equity.

The relation of Holmes Colbert to the Chickasaw Nation was of a very high trust and confidence, and his appointment of commissioner to collect the claims of the Chickasaw Nation against the United States was presumably induced by a reliance on his skill, learning, ability, integrity, judgment and discretion. When he died, the duty and right to perform his contract with his client did not devolve upon his executors, administrators, or heirs; and they could not lawfully employ any one to perform the same. Plaintiff's contract with Peel, by which they sought to do so, was without authority and of no force or effect.

Before this contract was made, on the 8th of May, 1872, the Legislature of the Chickasaw Nation by an act authorized and required the Governor of that Nation "to appoint some competent person as commissioner to fill the vacancy caused by the death of Holmes Colbert, to take charge of and to carry out the programme begun and commenced by the said H. Colbert without alteration or amendment; to make all necessary settlements, to carry out contracts made by the said H. Colbert with attorneys at Washington, as originally agreed upon by him;' and to pay over all moneys due to his widow or administrator, if any, by reason of services already performed. This was a denial to plaintiffs of the right to make such contracts as that undertaken by them. The Chickasaw Nation had the right to employ one or more attorneys to collect its claims. The fact that it had one, if it had, did not deprive it of the right to employ another. The contract made by its Governor, by authority of its act, with Peel, on the 26th day of September, 1894, whether it employed him as sole or additional counsel, was a valid contract. His services were rendered under that contract, and he is entitled to the fee stipulated.

The weight of evidence adduced in the hearing of this cause shows that Love paid Peel on the contract he made with him $2,500. Peel, in an effort to perform this contract, spent divers sums of money, amounting to $1,500, and performed professional services worth as much as $1,000. It was not his fault that the object of the contract was not accomplished. These expendi-

tures were made and services were performed virtually at the request of Love and under his directions; and Peel should not bear the losses.

Decree affirmed.

ON REHEARING.

Opinion delivered July 23, 1906.

BATTLE, J. Appellants insist that appellee, having been employed by them to collect the interest due the Chickasaw Nation on a certain claim, and having recovered the same, and received for his services the sum of $55,852.05, is entitled only to retain so much thereof as they agreed to pay him for such services; and that the remainder thereof he holds in trust for them. They argue that, having been first employed by them, he could not in good faith accept employment by the Chickasaw Nation to render the same service, and in law and equity was not permitted to do so, and should be held bound to account to them for moneys received for his services over and above the fee they agreed to pay him. Is this contention correct?

They claim under the contract of the Chickasaw Nation with Holmes Colbert. That contract expired with the death of Colbert. They claim that Colbert was employed to collect money which belonged to the Chickasaw Nation. They had no authority to employ Peel to collect it, and their contract with him did not empower him to do so. It does not appear that, at the time they undertook to contract with Peel, the Chickasaw Nation was indebted to either of them, or that any part of the interest he thereby undertook to collect belonged to them or either of them. The contract was void. Peel recovered nothing under it, and held no money received by him in trust for them.

Peel was engaged about five years in prosecuting the claim of the Chickasaw Nation for interest against the United States, under his contract with the Chickasaw Nation made on the 26th day of September, 1894. Love testified that he did not know that Peel had abandoned the contract with him until after Peel had received his fee of ten per cent. On the other hand, Peel testified that he met Love after he was employed by the Chickasaw Nation, and they "talked the matter over freely," and "discussed

the propriety of Love trying to get the Nation to give him some additional contract under the statutes, so he might be able to collect something;" and that he knew all about the employment of Peel by the Chickasaw Nation, and never made any objection to it, and never at any time, before the claim was collected, claimed any interest therein or any share in the fee earned thereby. No other witness testified as to these facts about which the parties disagree. The weight to be given to the testimony of each depends upon the circumstances. One of the most important of these circumstances is the time Peel was engaged in prosecuting the claim under his contract with the Nation. He was engaged about five years. If Love believed he was prosecuting it under the contract with him, it would have been natural and reasonable for him to have supervised the prosecution, and from time to time made some inquiries about its progress and prospects of success. The large amount involved, and the obligation he assumed by his contract with Peel, were sufficient to have induced him to give it his most earnest attention. Had he done so, and the presumption is he did, he would doubtless have in the course of five years discovered under what contract Peel was acting. There was no reason or necessity for Peel withholding correct information, practicing fraud or deception, and there was nothing to be gained by it. This circumstance (time) then corroborates the testimony of Peel and gives it preponderance. The publicity of the contract with the Nation, it having been entered into under a special act of the Chickasaw Legislature, and its great importance, on account of the considerable amount involved, to the Chickasaw Nation, and the prominence of Love in Indian affairs, he being a prominent and active member of the Nation and participant in its affairs, also tend to corroborate Peel's testimony.

Love having, without objection, knowingly permitted Peel to prosecute the claim of the Chickasaw Nation, under his contract with that Nation, for a long period of time, and incur a great expense in so doing, is estopped from claiming any portion of the fee received by him under the same. His co-plaintiffs, who claim under his contract with Peel, are also estopped; they claiming under and through him. Perry on Trusts (5 Ed.), § § 467. 849, 853, 870.

Appellants, in their motion for reconsideration, insist that

Love paid Peel $7,500 as a retainer, instead of $2,500. In the opinion of this court it is stated that "the weight of evidence adduced in the hearing of this cause shows that Love paid Peel on the contract he made with him $2,500." Love testified that he paid Peel $7,500 as a retainer, on the contract. Peel testified that he paid him $2,500 as a retainer, and $5,000 to be paid to Ex-Governor Sharpe of Kansas, which he paid. The receipt appended to the contract at the time it was executed shows that it was $2,500, and corroborates the testimony of Peel, and sustains the statement made by the court in its opinion.